**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>   **v.**<br><br>**MEANNU SEMAJ,**<br><br>   **Defendant.** | **Case No. 26-MJ-079** |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States respectfully submits this memorandum in support of its oral motion for detention pending trial under 18 U.S.C. § 3142(f)(1)(E) (Felony Involving Possession or Use of a Firearm) and under 18. U.S.C. § 3142(d)(1)(A)(iii) (On Probation or Parole) as the Defendant, Semaj Meannu[1], is charged with violating 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Previously Convicted of an Offense Punishable by More Than One Year Incarceration). The Defendant stands before this Court charged with possessing a loaded firearm he forcibly and brazenly robbed from a Brinks security employee while the employee was servicing an ATM kiosk in Gallery Place Metro station at 2:20 PM in the afternoon. At the time of the offense, the Defendant was on supervised probation for a 2025 conviction for Assault in the Second Degree in which the Defendant violently, and without provocation, assaulted service workers at two different establishments. Due to the Defendant's extremely troubling behavior in this case and his criminal history, a review of the 3142(g) factors shows that no condition or combination of conditions will reasonably assure the safety of the community.

---

[1] The Defendant's legal name is Semaj Meannu

## BACKGROUND

On April 22, 2026, the United States filed a complaint charging the Defendant with Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g). The next day, the initial appearance was held before the Honorable Magistrate Matthew J. Sharbaugh. After the United States made a motion for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(E), the Court set a detention hearing for Monday, April 27, 2026.

### *The Instant Offense*

On Wednesday, April 15, 2026, at approximately 2:20 PM, V-1, who is an armed Brinks security officer, was servicing an ATM near the kiosk at the 7th Street NW and H Street NW Gallery Place Metro entrance while wearing Brinks Security uniform. While servicing the ATM, the Defendant, Semaj Irie Meannu, approached V-1 from behind and grabbed V-1's company-issued handgun, an FN 509 semi-automatic nine-millimeter pistol, bearing serial #BUS17608, in its holster. V-1 felt the Defendant grab his gun, and V-1 responded by grabbing a hold of the Defendant's hands to prevent him from removing the gun from the holster. V-1 struggled with the Defendant, twisting his hands, and then shoved him to separate the Defendant from the gun. However, the Defendant did not relinquish his grip on the firearm, and when V-1 shoved the Defendant, the Defendant ripped the gun and the holster from V-1's waistband. The gun fell to the ground next to the Defendant, while the holster skidded on the ground in the opposite direction. The Defendant picked up the gun and fled up the escalator out of the station. V-1 did not suffer any injuries during the altercation. V-1 described the defendant as a black male wearing a dark green shirt and gray shorts.

Video surveillance from the incident showed the Defendant's appearance, the lead up to

the offense, and the altercation itself.

Troublingly, the video surveillance from outside of the stations showed the Defendant loitering outside of the station, and when V-1 walked past him to enter the station, the Defendant followed him into the station



*Figure 1 - (LEFT) Defendant loitering by the metro entrance as V-1 walked past. (RIGHT) Defendant following V-1 to the metro station.*

Video from inside of the station showed the Defendant wearing heel-less footwear, black shorts, grey long-sleeve shirt, and blue socks.



***Figure 2 - Still image of MEANNU preceding the taking of the Brinks security officer's firearm. Blue socks and heel-less footwear are visible***

After the incident, the surveillance showed the Defendant exit the station, run southbound on 7th Street, turn right going westbound on G Street NW, and then re-enter the station at the 9th and G Street NW entrance. The surveillance showed the Defendant clutching his left arm against his waistband, consistent with securing a heavy object.

The victim called 911 and police officers responded to the scene within minutes of the assault. Officers obtained a description and consulted video surveillance from the station and the surface streets in real time. A description and images of the Defendant were circulated to officers looking for the Defendant.

One of those officers, Metropolitan Police Department Officer Rock, was inside of the Gallery Place Metro station near the 9th Street NW and G Street NW entrance along with National Guard members Smith, Williams and Sergeant Tillman, when at 2:50 PM, he encountered the Defendant at the 9th by the exit gates. Officer Rock immediately recognized the Defendant based

on the description broadcasted for the suspect, as well as surveillance stills that were distributed of the suspect after the incident and stopped and detained the Defendant. National Guardsman Williams detained the defendant in flexicuffs and conducted a protective pat-down of MEANNU, during which he recovered a handgun from MEANNU's front waistband.



*Figure 3 - Stills of MEANNU immediately after apprehension. LEFT shows MEANNU's face. RIGHT shows MEANNU's blue socks and footwear.*

Additionally, National Guardsman Williams safely cleared the weapon and advised there was no round in the chamber. MTPD Crime Scene Officer Krentsa documented the incident and processed the handgun. The firearm recovered was identified as the firearm stolen from V-1 based on the model and serial number, which matched the firearm that was stolen from V-1.

A show up was conducted with V-1 at approximately 3:01 PM, and V-1 positively identified the Defendant as the person responsible for the physical altercation and taking his handgun. The handgun recovered from MEANNU was V-1's service weapon, as evidenced by the serial number observed on the firearm.

**Defendant's Criminal History & Performance Under Supervision**

The Defendant committed this offense while under supervised probation for a recent conviction for Assault in the Second Degree, and he has a felony conviction in California[2] for Resisting or Deterring an Officer from 2020. Below is a chart illustrating the Defendant's prior criminal history and potential sentencing guideline in the instant matter.

| Offense | Date | Sentence | Points |
|---|---|---|---|
| **D-05-CR-25-013748** Assault in the Second Degree (Prince George's County, MD) | Incident: 4/27/2025 Sentence: 8/4/2025 | 6 years incarceration, execution of sentence suspended as to all but 100 days | 1 (4A1.1(c)) |
| **INF1902144** Resisting or Deterring Officer (California) | Arrest: 12/24/2019 Sentence: 12/10/2020 | 121 days incarceration, followed by supervised probation | 1 (4A1.1(c)) |
| | | **POINTS: 2** **TOTAL POINTS: 2 – Criminal History II** | |

**922(g) (Firearm) – 2K2.1**

| USSG § | Description | # |
|---|---|---|
| § 2K2.1(a)(3)(A)(i), (B) | Base Offense Level | 14 |
| § 2K2.1(b)(4)(A) | Firearm stolen | 2 |
| | *Total* | *16* |
| | *Exposure w/o AOR: **24-30 months*** | |
| | *Exposure w/ AOR (-2): **18-24 months*** | *14* |
| | *Exposure w/ AOR (-3): **15-21 months*** | *13* |

*D-05-CR-25-013748*

According to the Statement of Probable Cause, this case in fact involved two separate assaults committed with hard objects on the same day. First, at approximately 6:00 AM on April 27, 2025, at the 7-Eleven located at 7201 Baltimore Avenue, College Park, MD 20740, the

---

[2] The government is attempting to obtain further detail regarding this conviction.

Defendant attacked a sales associate without provocation by striking him numerous times with a stick, causing numerous contusions to her face. The victim had to be transported to White Oak Hospital for medical treatment.

Then, less than three hours later, the Defendant attacked a sales associate at Playa Bowls by striking him numerous times in the face with a rock. The attack left the sales associate with a severe face laceration that were bleeding profusely when officers arrived on scene.

**Other Arrests**

**MTPD 25-27651:** On November 14, 2025, at about 7:33 AM, officers were called to the Gallery Place Metro Station for a report of a man with a knife. Metropolitan Transit Police officers and Metropolitan Police officers responded. In the station, MPD Officer Galery found the Defendant standing in the first car of a train stopped at the red line platform holding a knife. Officer Galery ordered the Defendant off the train, and he complied, but continued holding the knife. The train left the station, leaving the Defendant with the officers. Officer Galery pleaded with the Defendant to drop the knife, but the Defendant refused. Instead, the Defendant fled with the knife by jumping onto the red line tracks, crossing both tracks, climbing up on the opposite platform, and then running to an exit at a different area of the station.

The Defendant managed to exit the station, but MTPD officers apprehended him at the top of the escalator at 7th and H Street NW. According to the MTPD report completed for the incident, the Defendant stated the following when interviewed by officers:

> Mr. Meannu…stated that he was homeless. Mr. Meannu described wanting to take his own life. Mr. Meannu states that he slept in the area of the MLK library the night prior and began to have thoughts of suicide. Prior to entering the station Mr. Meannu states that he began to cut his wrist with a knife he had in his possession but could not continue to cut his wrists anymore. Mr. Meannu states that he attempted to commit suicide by an officer but then feared being shot and ran from

a pursuing officer.

**CCN 25184229:** On December 6, 2025, Metropolitan Transit Police Officers encountered the Defendant inside of the L'Enfant Metro Station holding an open alcoholic beverage – Sweet Red Yellow Tail. Officers began the process of issuing the Defendant a criminal citation, but the Defendant refused to provide his name. Due to his refusal, officers attempted to place the Defendant under arrest, but he became non-compliant by grabbing a railing for the platform. Officers were compelled to sweep the Defendant's leg and deploy OC spray to gain compliance. The case was ultimately no papered.

**LEGAL AUTHORITY AND ARGUMENT**

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210, and *Williams*, 798 F. Supp. at 36.

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a Defendant] as required and the safety of

any other person and the community," the Court shall order a Defendant held pending trial. 18 U.S.C. § 3142 (e). The Act provides however, for certain crimes, that there is a rebuttable presumption that no conditions or combination of conditions will assure the safety of the community. *See id.* "For the purposes of making that determination, a grand jury indictment, by itself, establishes probable cause to believe that a Defendant committed the crime with which he is charged." *United States v. Taylor*, 289 F. Supp. 3d 55, 62–63 (D.D.C. 2018) (internal quotations omitted).

The United States seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(E) (felony involving a firearm) because the Defendant is charged with committing a firearm offense. The United States is also seeking detention pursuant to 18. U.S.C. § 3142(d)(1)(A)(iii) (On Probation or Parole) as the Defendant was on probation in Maryland for his 2025 conviction for Assault in the Second Degree. A review and understanding of the facts and circumstances in the instant matter demonstrate that there are no conditions or combination of conditions that would assure the safety of the community. *See* 18 U.S.C. § 3142(e)(1). All four § 3142(g) factors favor detention pending trial, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the Defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

I.      **The Nature and Circumstances of this Offense Merits Detention**

The first factor to be considered, the nature and circumstances of the offense charged, weighs in favor of detention. The Defendant is charged with a serious offense carrying a significant penalty. For violating 18 U.S.C. § 922(g), the Defendant faces a maximum sentence of up to 15 years imprisonment pursuant to 18 U.S.C. § 924(a)(8).  Moreover, though the Defendant is not

charged with this offense at this time, if the conduct is charged as 18 U.S.C. § 1951, the maximum penalty for the offense is 20 years. The evidence in this case is compelling. The video evidence clearly shows the Defendant observed the victim, and then specifically targeted him, following him into the metro station and waiting until the victim was kneeling on the ground, with his back to the defendant, servicing the ATM machine. When the victim was in this vulnerable position, the Defendant seized the moment to creep up behind the victim and steal the officer's gun. A physical altercation ensued in which the either the defendant or the victim could have purposefully or accidentally discharged the firearm, putting not just both of their lives in danger, but also the lives of innocent metro riders in danger. Indeed, video footage from this offense shows that metro passengers were passing by throughout the offense and ensuing physical altercation. The danger to the community was compounded as the defendant ran through a busy urban center, in the middle of the afternoon, armed with a firearm.

Less than thirty minutes later, officers spotted the Defendant inside of the same Metro station wearing the same clothing and in possession of the stolen firearm. Just as the Defendant's act of stealing the firearm put the public at risk of an unexpected discharge, the apprehension of the armed defendant in the metro station again placed the public at harm. Once again, camera footage – specifically, officer body worn camera, shows metro passenger mere feet away from the defendant as officers and National Guard members stopped and apprehended him. The firearm, when it was recovered, was ready for use. It was loaded and tucked into the Defendant's waistband.[3] These innocent metro passengers, like the passengers present for the offense itself,

---

[3] The Court has repeatedly held that possession of a firearm, when loaded or carried in a concealed manner as in this case, poses a risk of danger to the community. *See, e.g., United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence," particularly when Defendant's prior convictions indicate a predilection for violence); *United States v. Riggins*, 456 F. Supp. 3d 138, 144 (D.D.C. 2020); *United States v. Gassaway*, No. 21-cr-550 (RCL), 2021 U.S. Dist. LEXIS 175978 at *9-10 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-mj-181 (BAH), 2020 U.S. Dist. LEXIS 172978, 2020 WL 5642288, at *3 (D.D.C.

were not only placed in harm's way, but also subject to the trauma of seeing a dangerous firearms offense play out mere feet away from them.

## II.    The Weight of the Evidence Against the Defendant is Strong.

The second factor to be considered, the weight of the evidence, strongly weighs in favor of detention. Indeed, the Government's case against the Defendant is overwhelming. As discussed above, the taking of the victim's firearm, along with his subsequent arrest and recovery of the firearm, were all captured on either video surveillance and/or body worn camera.  All of the video is high quality, in color, and in the case of the BWC, includes audio.  The Defendant was stopped within approximately thirty minutes of the offense, in close geographic proximity to the offense, and then subsequently identified by the victim within one hour of the offense.  Even if the victim had not clearly and unambiguously identified the defendant in a short time, the victim is readily identifiable based upon his unique clothing and physical characteristics seen in the video from the offense and arrest.  The defendant also has no viable defense in this case – this is not a case where identification, possession, or even self-defense are present in any way. The evidence in this case is straightforward, objective, and comes in the form of both direct and circumstantial evidence.  In short, the defendant should expect to be found guilty at trial.

## III.    The Defendant's History and Characteristics Merit Detention.

The third factor, the Defendant's history and characteristics, also weigh heavily in favor of

---

Sept. 21, 2020) ("Illegally possessing a concealed firearm in public where other people are congregated, as alleged, poses an inherent risk of danger to the community."); *see also United State v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020) (holding that a Defendant should be detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling"), *aff'd* (D.D.C. Nov. 5, 2020). The firearm recovered from had many of these troubling characteristics, and more broadly, the firearm was loaded and ready to fire when it was recovered. Simply stated, unlawful gun possession is so problematic, especially by someone with the Defendant's criminal history, because of the number of violent gun crimes committed in the District.

detention. The Defendant was previously convicted of Assault in the Second Degree less than one year ago, and he has a felony conviction in California for Obstructing and Resisting a Police Officer for which probation was closed unsatisfactorily in 2022. Moreover, according to the PSA Report, he is currently non-compliant with his existing probation.

The Government would note that this Court has routinely held Defendants who have been charged with firearms possession while on probation or release. *See United States v. Deangelo Palmer,* 26-cr-037 (Defendant had loaded firearm and 2.5 pounds of suspected cocaine in vehicle, was on probation for a 2016 armed robbery); *United States v. Bishop*, 25-mj-124 (Defendant who fled from police, had been on supervised release for CWPL for approximately 7 months and had history of prior gun arrests)*; United States v. Isaiah Pushia-Keith*, 25-cr-196 (Defendant possessed ghost gun while on supervised probation for a domestic violence felony conviction and had two additional domestic violence convictions); *United States v. Holland*, 25-mj-129 (Defendant had prior CPWL conviction and history of pretrial non-compliance and failures to appear); *United States v. Linnell Shelton*, 25-cr-874 (Defendant found in possession of firearm while overdosing and on supervised release for a prior voluntary manslaughter conviction); *United States v. Kelon Dukes*, 25-cr-068, (Defendant on supervised probation for a CPWL conviction); *United States v. Kemani Rhodes*, 25-cr-156 (Defendant possessed a dis-assembled assault rifle while on probation for another firearms offense and had an arrest warrant issued for assault and home invasion charges in Maryland); *United States v. Jevaun Hodge*, 25-mj-063 (Defendant on supervised release at time of arrest and had history of non-compliance). *United States v. Stephan Freeman,* 25-cr-127 (Defendant had a gun in a backpack held due to non-compliance with court orders, including a civil protection order); *United States v. Bruce Hart*, 24-cr-528 (Defendant conceded detention when he was arrested while on probation for two Virginia convictions); *United States v. Brandon*

*Smith*, 24-cr-574 (Defendant who had a gun in a satchel by his feet had just completed supervised release for Robbery and PFCOV just twenty-six days before new offense).

So it should be in this case. The Defendant was on probation for a felony assault case that in fact involved two unprovoked assaults committed where he weaponized ordinary objects. This offense now marks a dangerous escalation in conduct in which the Defendant armed himself with a firearm, giving him the ability to use lethal force with the pull of a trigger. The Defendant has shown he is willing to disregard the law, even while on supervised release for a serious offense, and place the lives of uninvolved citizens at risk. Consequently, this factor weighs in favor of detention.

## IV.    The Defendant Presents a Danger to Our Community.

The fourth and final factor, danger to any person or the community posed by the Defendant's release, overwhelmingly weighs in favor of detention. As discussed above, the Defendant has a documented history of engaging in assaultive behavior against strangers in the community. Moreover, the incident in November, where the Defendant discussed committing suicide by police officer is extremely troubling. Such behavior poses mortal danger not only to the Defendant, but also to police officers and other members of the community who could be innocent bystanders.

The D.C. Circuit has noted that "'[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community,'" pretrial detention is available to "'disable the arrestee from executing that threat.'" *Munchel*, 991 F.3d at 1280 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).  This requires the Court to make a "forward looking determination" about the Defendant's risk of danger

to the community, keeping in mind that detention may be justified even if the Court does not explicitly find that Defendant is a risk of committing acts of violence. *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) (citing *Munchel*, 991 F.3d at 1283).

Here, the evidence from the last twelve months shows that the Defendant poses an obvious and articulable threat to the community who has engaged in ever-escalating behavior.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court detain the Defendant pending trial on these charges.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   *s/ Travis Wolf*
  TRAVIS WOLF
  Assistant United States Attorney
  NY Bar No: 5483243
  United States Attorney's Office
  601 D Street, NW
  Washington, D.C. 20530
  Telephone: 202-803-1670
  Travis.Wolf@usdoj.gov